IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ASHLEY FURNITURE INDUSTRIES, INC.,

                              Plaintiff,                               OPINION AND ORDER

     v.

                                                         16-cv-469-wmc

PACKAGING CORPORATION OF AMERICA,
*et al.*,

                              Defendants.

---

Plaintiff Ashley Furniture Industries, Inc. ("Ashley") is a purchaser of containerboard products who alleges that between 2004 and 2013, defendants, containerboard manufacturers, conspired to restrict output and raise prices in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Before the court are defendants' partial motions to dismiss plaintiff's claims of a conspiracy lasting beyond 2010 and plaintiff's state law claims under Wis. Stat. § 133.14. As explained in more detail below, because plaintiff has plausibly alleged a conspiracy extending into 2013, and because its claims as to § 133.14 are adequately pled, defendants' motions to dismiss will be denied. Nevertheless, the court will grant in part the parties' recent, joint motion to stay further proceedings for the reasons set forth at the end of this opinion.

BACKGROUND

In its second amended complaint, which is the operative pleading, Ashley alleges an ongoing conspiracy among defendants to restrict output and raise prices of containerboard products between 2004 and 2013. As explained in more detail in this court's opinion and

order on defendants' motion to transfer this case to the Northern District of Illinois, *Ashley Furniture Industries, Inc. v. Packaging Corp. of America*, No. 16-cv-469-wmc, 2017 WL 3207061 (W.D. Wis. July 28, 2017), plaintiff opted out of *Kleen Products LLC, et al. v. International Paper, et al.*, Case No. 1:10-cv-05711, a class action involving substantially similar claims and defendants, but which was limited to a conspiracy period between 2004 and 2010.

Generally speaking, the second amended complaint includes allegations that beginning in or around 2004, the containerboard industry was experiencing decreasing profit margins and increased demand. (2d Am. Compl. (dkt. #95) ¶ 6.)  In response to those market conditions, plaintiff alleges that defendants agreed to a scheme to restrain capacity artificially, and thus charge supra-competitive prices. (*Id.*)  The second amended complaint further alleges that in their effort to collude, defendants were aided by common membership in industry and trade organizations, as well as consolidation and other market characteristics in the containerboard industry that are conducive to price-fixing. (*Id.* at ¶¶ 37-46.)

Although, as already mentioned, *Kleen Products* is limited to an alleged conspiracy period ending in 2010, Ashley alleges that similar market dynamics and behaviors characteristic of price-fixing collusion continued through 2013.  Among these were additional acquisitions, adjustments of capacity and coordinated price increases. (*Id.* at ¶¶ 185-90.)  WestRock RKT Company, formerly Rock-Tenn Company, was responsible for one of these acquisitions.[1]  In 2011, WestRock RKT acquired Smurfit-Stone Container

---

[1] Plaintiff named WestRock RKT Company as a defendant in the second amended complaint, but

Corporation, which had emerged from bankruptcy a year earlier, and merged it into a subsidiary, creating RockTenn CP, LLC, which itself later became defendant WestRock CP, LLC. (*Id.* at ¶ 20.)

In addition to Sherman Act Section 1 claims, plaintiff's second amended complaint also includes claims that defendants' conspiracy gives rise to additional remedies under Wisconsin state law. Specifically, plaintiff alleges that all of its contracts or agreements for purchases of containerboard products from defendants arise out of an illegal antitrust conspiracy in violation of Wis. Stat. § 133.03. Accordingly, plaintiff seeks to recover "all payments made under the void contracts or agreements" under § 133.14. (*Id.* at ¶ 215.)

OPINION

I.    **Conspiracy Period**

All defendants move to dismiss plaintiff's claims that an illegal agreement extended beyond 2010 through 2013.[2] Opting not to challenge plaintiff's allegations of a conspiracy between 2004 and 2010, the same conspiracy period litigated in *Kleen Products*, defendants argue primarily that plaintiff has failed to plead allegations of a conspiracy between 2011

_____

those parties stipulated to the dismissal of all of plaintiff's claims against WestRock RKT, which the court accepted on August 25, 2017, having heard no objection from any of the other defendants. (Dkt. #142.)

[2] Defendant Georgia-Pacific LLC filed its own brief in support of its motion to dismiss the post-2010 conspiracy claims or, in the alternative, for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. ##109-10.) The remaining defendants -- International Paper Company, WestRock CP, LLC and Packaging Corporation of America -- joined in the brief in support of the motion to dismiss filed by defendants Temple-Inland Inc., TIN Inc., Cascades USA, Inc., Cascades Canada ULC and Weyerhaeuser Company. Because the differences between the parties' briefs are immaterial for purposes of resolving their motions, the court will not address them separately.

and 2013 with sufficient factual specificity to pass muster under the plausibility pleading standard described in the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554,556 (2007).[3]

More specifically, defendants argue that it is not enough for plaintiff to maintain a § 1 claim for the three-year period beyond that claimed in *Kleen Products* by simply alleging: (1) Smurfit's 2011 acquisition by WestRock RKT after bankruptcy; (2) International Paper's 2012 acquisition of Temple-Inland; and (3) two parallel price increases in 2012 and 2013. (*See* Defs.' Opening Br. (dkt. #115) at 12 (citing 2d Am. Compl. (dkt. #95) ¶¶ 185-86, 189-90).) Moreover, with regard to the mergers, defendants point out that both were cleared by the United States Department of Justice. (*Id.*) With respect to another allegation in the second amended complaint, defendants also assert that plaintiff misleadingly quoted an article analyzing stocks, which was published on the Internet, to infer that containerboard capacity -- as opposed to other paper products -- decreased during this three-year period, an assertion that plaintiff conspicuously fails to address. (Def.'s Opening Br. (dkt. #110) at 5-7; Defs.' Opening Br. (dkt. #115) at 13.)

Defendants bolster their arguments by citing cases standing for the proposition that the filing of the 2010 lawsuit in *Kleen Products* neutralizes any plausible inference that an illegal agreement continued after its commencement. *See In re Domestic Drywall Antitrust Litig.*, Civil Action 15-cv-1712, MDL No. 13-2437, 2016 WL 3453147, at \*3 (E.D. Pa. June 22, 2016) (describing claims based on price increases in last two years of alleged

---

[3] Plaintiff concedes that for purposes of defendants' motion, the conspiracy began no earlier than 2004. (Pl.'s Opp'n Br. (dkt. #130) at 16.)

conspiracy period to be implausible as pled, "[e]specially in light of the intervening [class actions filed against the defendants]"); *In re Folding Carton Antitrust Litig.*, 465 F. Supp. 618, 622 n.3 (N.D. Ill. 1979) (noting that "it is highly improbable that the price fixing conspiracy was continued in 1975 while the government's criminal investigation was progressing"), *vacated on other grounds*, 699 F.2d 867 (7th Cir. 1979).

In response, plaintiff essentially argues that truncating the end date of the alleged conspiracy at the pleadings stage makes little sense given that no defendant moves to dismiss the allegations of a conspiracy between 2004 and 2010. In doing so, plaintiff cites a handful of cases for the notion that parties should not "dismember" conspiracy allegations and evaluate their sufficiency separately, as well as the notion that a conspiracy is presumed to continue until an affirmative showing of abandonment. (Pl.'s Opp'n Br. (dkt. #128) at 2-3.) Plaintiff also attempts to draw a contrast between allegations of the conspiracy's start date and its end date for purposes of deciding a motion to dismiss, suggesting that courts have more closely scrutinized the former.

Bolstering its argument, plaintiff points to *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014), in which the district court found that although the plaintiffs did not adequately plead the beginning of a conspiracy period, the end of the alleged period should not be similarly trimmed, particularly in light of the plausible inference that the defendants did better to conceal their illegal agreement over time. *Id.* at *12 ("[I]n this later period, unlike in the years 2000 and 2001, the relative paucity of allegations is plausibly explained by increased care and efficiency in the operation of the conspiracy.").

While the case that plaintiff cites in support of its argument that the adequacy of allegations as to the end of a conspiracy should be viewed more leniently than those as to its beginning is largely inapposite as applied here, the court agrees with plaintiff that the conspiracy allegations here between 2011 and 2013 have been adequately pled, albeit just barely. Defendants contend that the allegations as to that period are inadequate in part because plaintiff does not allege any "specific meetings or communications" during that time. *See In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076 (D. Kan. 2009) (truncating the start of the alleged conspiracy in large part because there were "no allegations of specific meetings or communications occurring during that period," as opposed to the allegations with respect to a later period); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2016 WL 5108131, at \*16-17 (dismissing claims that a conspiracy existed before 2007, since they were based only on communications dating back to 2004 that the plaintiffs did not even suggest "reflected unlawful conduct"); *In re Lithium Ion Batteries*, 2014 WL 309192, at \*12 (dismissing as implausible claims that a conspiracy began in 2000, which was "reflected in the dearth of meetings alleged in the complaint in the years 2000 and 2001").

But taking as true plaintiff's allegations regarding the two acquisitions in 2011 and 2012 that further consolidated the containerboard industry, as well as two, lockstep price increases in 2012 and 2013, it is at least plausible that an illegal conspiracy continued into 2013, particularly given plaintiff's allegations with respect to the nature of the containerboard industry and its susceptibility to price-fixing agreements, which plaintiff asserts only intensified between 2011 and 2013. *See In re Lithium Ion Batteries*, 2014 WL

309192, at *12 (refusing to limit conspiracy period of 2009-2011 supported by only "sparse" allegations, namely "a single bid-rigging incident involving two defendants in 2009, and another in 2010"); *cf. In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 660-61 (E.D. Mich. 2011) (rejecting the defendants' argument, "rely[ing] heavily" on *In re Urethane*, that the alleged conspiracy period should be trimmed at the pleadings stage).

Further tipping the scale of plausibility is the inference that despite the filing of *Kleen Products* in 2010, defendants maintained their illegal agreement through arguably more covert means than trade association meetings, which the court cannot rule out as unreasonable at this stage of the litigation, even though the ultimate proof of that fact appears improbable. *See Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotation marks omitted). Indeed, the court maintains a healthy skepticism about the continuation of a conspiracy post-2010 for reasons already discussed, which will have to be overcome on summary judgment. Defendants' motions to dismiss plaintiff's claim of an ongoing conspiracy in violation of § 1 of the Sherman Act must be denied.

II.    **Wis. Stat. § 133.14**

As noted, certain defendants also move to dismiss plaintiff's state law claim to recover payments made on contracts invalid under Wisconsin antitrust law pursuant to Wis. Stat. § 133.14.[4]  (2d Am. Compl. (dkt. #95) ¶ 215.)  In full, that statute provides that:

> All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by s. 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person.  Any payment made upon, under or pursuant to such contract or agreement to or for the benefit of any person may be recovered from any person who received or benefited from such payment in an action by the party making any such payment or the heirs, personal representative or assigns of the party.

Wis. Stat. § 133.14.

**A. Privity**

Defendants first argue that plaintiff's purported claims under the state's little Sherman Act fail because plaintiff does not sufficiently plead that it entered into invalid contracts with them.  Among other cases, defendants cite *In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716 (9th Cir. 2013), which held that "the plain text of [Wis. Stat. § 133.14] . . . does not provide for recovery for indirect purchasers or

---

[4] Specifically, defendants Temple-Inland Inc., TIN Inc., Cascades USA, Inc., Cascades Canada ULC and Weyerhaeuser Company moved to dismiss plaintiff's § 133.14 claim, and defendants Packaging Corporation of America and WestRock CP, LLC joined in the portion of that motion challenging whether plaintiff alleges sufficient Wisconsin contacts as discussed below.

other non-parties to [a] contract." *Id.* at 747; *see also Rozema v. Marshfield Clinic*, Nos. 96-C-592-C, 96-C-916-C, 96-C-730-C, 1997 WL 416292, at *15 (W.D. Wis. Mar. 10, 1997) ("To the extent that there is no contract between a specific plaintiff and a specific defendant, § 133.14 will not apply."). In so holding in *Western States*, the Ninth Circuit noted in particular that "[t]he second sentence of Section 133.14 permits the party making a payment 'upon, under or pursuant to such contract' to recover those payments." 715 F.3d at 746.

Plaintiff insists that § 133.14 is not so limited, arguing that the statute provides for "co-conspirator liability." (Pl.'s Opp'n Br. (dkt. #130) at 11.) According to plaintiff, the Ninth Circuit and the district court decision it affirmed, *In re Western States Wholesale Natural Gas Antitrust Litigation*, 619 F. Supp. 2d 1062 (D. Nev. 2008), got it wrong by holding the opposite, having failed to appreciate that the Wisconsin Legislature's general pronouncement of intent in Wis. Stat. § 133.01 requires Chapter 133 to "be interpreted in a manner which gives the most liberal construction to achieve the aim of competition." Plaintiff criticizes the *Western States* district court specifically for failing to cite either of two Wisconsin Supreme Court cases endorsing the broadened scope of Chapter 133 after it was amended in 1980. *Meyers v. Bayer AG*, 2007 WI 99, 303 Wis. 2d 295, 735 N.W.2d 448, and *Olstad v. Microsoft Corp.*, 2005 WI 121, 284 Wis. 2d 224, 700 N.W.2d. As defendants point out, however, the relevance of the holdings of those cases to plaintiff's co-conspirator liability argument is limited, as neither even consider the remedies set forth in § 133.14.

Plaintiff further argues that by adding language permitting a plaintiff to recover contract payments from "any person who received *or benefited* from such payment" in the 1980 amendments to § 133.14, the Wisconsin legislature intended to extend "co-conspirator liability" to that provision.[5]  And, as plaintiff notes, even the *Western States* district court "conclude[d] that [while] the principles of joint liability for co-conspirators does not automatically attach to a § 133.14 claim, a co-conspirator may receive or benefit from a particular payment even though not a party to the contract and thus be a proper defendant to such claim under certain factual circumstances."  619 F. Supp. 2d at 1071.

As the defendant correctly points out in reply, however, the *Western States* court provided examples of such circumstances, including a corporation directing that a contract payment be made to "its subsidiary, agent, or some other third party on its behalf," or an agreement among co-conspirators to "share ill-gotten profits or pool and divide contract payments," none of which appear to apply remotely to the facts alleged here.  In particular,

---

[5] As cited by the district court in *Western States*, the pre-1980 amendments version of the illegal contracts and recovery provision provided that:

> All contracts or agreements made by any person while a member of any combination, conspiracy, trust or pool prohibited by s. 133.01 or 133.21, and which contract or agreement is founded upon, or is the result of, or grows out of, or is connected with, any violation of said sections, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom shall be had by or for any such person.  Any payments made upon, under or pursuant to such contract or agreement to or for the benefit of such person, may be recovered in an action by the party making any such payment, his heirs, personal representatives or assigns; provided that suit for such recovery is brought within 6 years after the making of said contract or agreement.

619 F. Supp. 2d at 1070 (quoting Wis. Stat. § 133.23 (1976)).

plaintiff makes no effort to propose how damages could be assessed against any co-conspirators who benefited from contract payments made to other co-conspirators in only the most abstract sense. *Id.* at 1071. Although plaintiff is correct that courts are to interpret Chapter 133 broadly, neither the plain language of § 133.14, nor the cases interpreting it, support the generalized theory of "co-conspirator liability" for which it advocates.[6] This court, therefore, agrees with *Western States* district court reasoning suggesting that a co-conspirator "benefitted from the conspiracy generally" is not the same as demonstrating that a co-conspirator "benefitted from 'such payment' under any void contracts." *Id.*

As defendants Cascades USA, Inc., and Cascades Canada ULC (collectively "Cascades"), the only basis for a § 133.14 claim that plaintiff can muster in the second amended complaint is their inclusion in the allegation that "*all* Defendants benefitted from each payment made by Ashley under the contracts or agreements . . . because each payment made under the contracts or agreements between Ashley and certain Defendants furthered the combination or conspiracy in which all Defendants participated and benefitted." (Pl.'s Opp'n Br. (dkt. #130) at 4 (emphasis and alteration in original) (quoting 2d Am. Compl. (dkt. #95) ¶ 27).) Since plaintiff "agrees that the [second amended complaint] does not

---

[6] There is a possibility that joint and several liability could provide the solution. *See Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002); *Segall v. Hurwitz*, 114 Wis. 2d 471, 339 N.W.2d 333 (Wis. App. 1983). *But see City of Madison v. Hyland, Hall & Co.*, 73 Wis. 2d 364, 243 N.W.2d 422 (Wis. 1976) (defendants may be held jointly liable for treble damages based on a bid-fixing conspiracy claim, but illegal contracts claim "would only concern the individual liability of particular defendants to particular plaintiffs"). Of course, plaintiffs are not left without a remedy against co-conspirators with whom they formed no illegal contracts under Wisconsin law, as § 133.18 provides for recovery of treble damages for antitrust violations, but plaintiff does not plead a claim for damages under that provision.

11

allege any contracts, agreements, or purchases of Containerboard Products by Ashley from Cascades," therefore, plaintiff has alleged no viable § 133.14 claim against them. (Pl.'s Opp'n Br. (dkt. #130) at 8 n.2.)

The court disagrees, however, that plaintiff has failed to adequately plead a § 133.14 claim against defendants Temple-Inland Inc., TIN Inc. and Weyerhaeuser Company. Indeed, plaintiff alleges specifically that it purchased containerboard products from each of the defendants. (2d Am. Compl. (dkt. #95) ¶ 27.) While defendants cite *Bissessur v. Indiana University Board of Trustees*, 581 F.3d 599, 602-03 (7th Cir. 2009), for the proposition that a plaintiff must do more than simply plead that a "contract existed," that case is wholly unhelpful to defendants here. In contrast to *Bissessur*, in which the plaintiff, a student, pleaded no facts to put the defendants on notice of the basis of his due process claim that Indiana University breached an implied contract for "a continuing education," *id.* at 603, plaintiff's complaint here gave defendants ample notice of the basis for its § 133.14 claims: Ashley Furniture purchased containerboard products from those defendants under contracts or agreements that are invalid because of a *per se* illegal antitrust conspiracy among themselves and other competitors, entitling it to recover payments made pursuant to the contracts' terms under Wisconsin law. *Cf id.* ("Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact."). Hopefully, none of the defendants will waste the court's time in the future with such a dubious application of a legal proposition plucked from an unrelated case.

12

## B. Wisconsin Contacts

This then leaves a lone question to be decided: whether plaintiff's § 133.14 claim against these defendants, along with defendants Packaging Corporation of America and WestRock CP, LLC, must be dismissed for failure to allege Wisconsin-specific contacts. In *Olstad*, the Wisconsin Supreme Court held that:

> Wisconsin's antitrust statutes may reach interstate commerce if (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.

2005 WI 121 at ¶ 1. Defendants argue that plaintiff's allegations satisfy neither of these prongs because plaintiff does not plead that any of the conspiracy-forming activity took place in Wisconsin, nor that any particular degree of defendants' conduct affected Wisconsinites.

In response to the defendants' argument as to the first prong of the *Olstad* test, plaintiff points to allegations in its second amended complaint that defendant Packaging Corporation of America "furthered the conspiracy in 2005 when it 'idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin,'" as well as its allegations that "each defendant sold Containerboard Products at supra-competitive prices into Wisconsin." (Pl.'s Opp'n Br. (dkt. #130) at 13-14 (citing 2d Am. Compl. (dkt. #95) ¶¶ 16-27, 79).) Whether an example of one defendant idling machines in Wisconsin, albeit at seemingly large volume in furtherance of a conspiracy formed and largely conducted by all defendants

13

outside the state is sufficient to satisfy the "actionable conduct," requirement under *Olstad* is at least open to argument. In contrast, considering the volume of sale of goods in Wisconsin at supra-competitive prices as "actionable conduct" under the first test would appear to swallow the second, which measures the impact of the illegal conduct on Wisconsin. The court need not resolve these questions under *Olstad's* first test, however, since the plaintiff has adequately alleged that defendants' conduct "substantially affects" this state.

In particular, plaintiff points to its allegations that Ashley Furniture, as a company with its principal place of business in Arcadia, Wisconsin, purchased containerboard products at supra-competitive prices due to defendants' *per se* illegal, horizontal conspiracy for almost a decade. Even this and likely layoffs at the Tomahawk plant were insufficient, plaintiff alleges quite plausibly that the containerboard industry involves sales of everyday products, such as corrugated cardboard boxes, and enjoys sales "in the tens of billions of dollars." (*Id.* at 14-15 (citing 2d Am. Compl. (dkt. #95) ¶¶ 15-27, 29-31, 79).) Under these facts, plaintiff rightly relies on the Wisconsin Supreme Court's holding in *Meyers* that "[a]n allegation that a group of pharmaceutical companies conspired to maintain monopoly prices on a best-selling prescription drug purchased by thousands of Wisconsin residents over several years meets the 'substantially [a]ffects' test set forth in *Olstad*." 2007 WI 99, at ¶ 57 (citation omitted).

In contrast, defendants argue that the allegations here are closer to those in *Emergency One, Inc. v. Waterous Co.*, 23 F. Supp. 2d 959 (E.D. Wis. 1998), which is one of the cases that the *Meyers* court distinguished in reaching its holding. In *Emergency One*, the

district court granted a motion to dismiss the plaintiff's Wisconsin law antitrust claims for lack of "significant and adverse effects on economic competition in Wisconsin."[7]  *Id.* at 971.  In reaching that conclusion, the district court explained that plaintiff, a Florida-based manufacturer of fire trucks, had only alleged "substantial adverse effects" on itself due to defendants' alleged conspiracy to inflate prices of water pumps, rather than to commerce in Wisconsin, having failed to, among other things, "indicate how many fire trucks [of the 3,500 to 4,000 trucks it claimed were purchased by fire departments each year] are sold in Wisconsin per year, how many by plaintiff, or how many by plaintiff's competitors."  *Id.*

Defendants again cite *In re Urethane* for essentially the same proposition.  In that case, a Kansas district court likened the facts to *Emergency One*, rather than those in *Meyers*.  663 F. Supp. 2d at 1084.  As here, the plaintiffs in that case had opted out of a certified class action, then asserted  claims under the laws of several different states, including Wisconsin, as well as European law, alleging a price-fixing conspiracy, although that case concerned "urethane chemical products."  *Id*. at 1069-70.  Applying Wisconsin law, the district court found inadequate allegations that:  (1) the plaintiffs were located or had a facility in Wisconsin and purchased the products from the defendants for use in this state, though not stating whether they bought the products here; and (2) defendants shipped "millions of dollars" of products to the plaintiffs and "other consumers" in Wisconsin.  *Id.* at 1084.  Although granting them leave to amend, the district court dismissed the plaintiffs' Wisconsin law claims, finding the "factual allegations only really show substantial effects

---

[7] Though decided before *Olstad*, the Wisconsin Supreme Court acknowledged in *Meyers* that the "adverse effects" standard applied in *Emergency One* was "in essence, the test [it] adopted in *Olstad*." 2007 WI 99 at ¶ 37.

on plaintiffs themselves," while revealing little "that could suggest the scope of the impact in Wisconsin as a whole." *Id.* at 1084-85.

Contrary to defendants' assertions, the court finds the facts alleged here as to effects on the people of Wisconsin to exceed in quality and quantity those in *Emergency One* and *In re Urethane*, as well as to adhere much more closely to *Meyers*. For example, plaintiff Ashley plausibly alleges that defendants' agreement to sell containerboard products at supra-competitive prices had a wide impact on Wisconsin, given its use in such products as corrugated cardboard boxes. In light of the alleged billions in sale and the ubiquitous use of container board by manufacturers, retailers and consumers each year, this court has little difficulty inferring that plaintiff's allegations satisfy the *Olstad* "substantially affects" test. Admittedly, plaintiff's second amended complaint lacks additional details that would be helpful to frame the likely scope of overcharges for containerboard products in Wisconsin, but "plaintiffs need not allege that the challenged conduct disproportionately affected Wisconsin, only that the challenged conduct substantially affected the people of Wisconsin and had impacts in this state."[8] 2007 WI 99 at ¶ 51; *see also id.* at ¶¶ 49-50 ("This court held in [*State v. Allied Chemical & Dye Corp.*, 9 Wis. 2d 290, 101 N.W.2d 133 (Wis. 1960),] that price-fixing is a monopolistic practice that, by its very nature, substantially affects the public."). Accordingly, the court will deny defendants' motion to

---

[8] At the very least, the court is satisfied that denying defendants' motion to dismiss under these circumstances presents little risk that endorsing "lesser standards would jeopardize the action, undermine the validity of [Wisconsin's] antitrust statute, and create the spectacle of Lilliputian harassment in Wisconsin courts." *Olstad,* 2005 WI 121 at ¶ 85.

dismiss plaintiff's antitrust conspiracy claims under Wis. Stat. § 133.14 claims as inadequately pled under the *Olstad* test.

## III.     Joint Motion to Stay

This then brings us to the parties' recent, joint motion to stay further proceedings in this case "pending the outcome of an appeal captioned as *Kleen Products LLC, et al. v. International Paper, et al.*, No. 17-2808 (7th Cir.), No. 1:10-cv-05711 (N.D. Ill.)."  (Dkt. #144 at 1.)  Although the plaintiff here alleges a conspiracy that lasted longer than that now under consideration by the Seventh Circuit in *Kleen Products* and only two of the defendants here remain in that case, there can be little doubt any opinion issued by the court of appeals will be invaluable to the parties, as well as the court, given the core conduct during the most robust period of the alleged conspiracy here is also at issue in that case. Unlike the parties, however, the court is unconvinced this stay need extend through any possible petition for *certiorari* review to the United States Supreme Court, which is a decision that can await another day.  Accordingly, the court will grant the joint motion as set forth below.  *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) (courts have "broad discretion to stay proceedings as an incident to its power to control its own docket").

ORDER

IT IS ORDERED that:

1) defendant Georgia-Pacific, LLC's partial motion to dismiss or for judgment on the pleadings (dkt. #109) is DENIED;

2) defendants Temple-Inland Inc., TIN Inc., Cascades USA, Inc., Cascades Canada ULC and Weyerhaeuser Company's partial motion to dismiss (dkt. #114) is GRANTED IN PART and DENIED IN PART consistent with this opinion;

3) defendant International Paper Company's partial motion to dismiss (dkt. #116) is DENIED;

4) defendant WestRock CP, LLC's partial motion to dismiss (dkt. #117) is DENIED;

5) defendant Packaging Corporation of America's partial motion to dismiss (dkt. #121) is DENIED; and

6) the parties' joint motion to stay proceedings (dkt. #144) is GRANTED IN PART as follows: (a) the instant proceeding are STAYED until the Seventh Circuit's ruling on the *Kleen Products* appeal; (b) the clerk's office is directed to administratively close this case until that time; and (c) the parties shall promptly notice this court of any substantive action by the Seventh Circuit in *Kleen Products* (as opposed to clerical, scheduling or other procedural matters).

Entered this 26th day of September, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge